The first case, 14-7, Plas-Pak v. Sulzer Mixpac AG 2014-14-47, and we are happy to hear from you, Mr. Wright. May I please begin? Good morning, Your Honors. So when arguing the 14-47 case, I'd like to address the Fukuda-Morris combination first and then move on to Jacobson and Hunter. So the Board erred in narrowly defining the principle of operation of Fukuda to include its system of stop valves and check valves. KSR instructs that a reference must be read for all that it teaches, including uses beyond its primary purpose. Now, in line with this teaching, this court in MUTET properly considered what it referred to as the overall principle of operation of the computing device in that case. Specifically, the overall principle of operation was found to be the device's high-level ability to receive inputs into a programmable crossbar array and processing the output to obtain an arithmetic result. In MUTET, the court also noted that the combination would not destroy the prior art reference's operability as a programmable arithmetic unit, which, again, is a broad statement of the reference's principle of operation. Now, this high-level ability approach to the principle of operation is correct because it is in line with KSR's basic tenets. For example, that a person of ordinary skill in the art will understand that familiar items may have obvious uses beyond their primary purposes. So here, the Board misapplied the law of principle of operation. The Board repeatedly confused Fukuda's principle of operation with its contribution to the art. For example, that can be seen in the Board's decision in the appendix at page JA11 and JA13. This is error. This is error under KSR, under MUTET, and under UMBRDUR. Now, it's similar to the circuitry of MUTET, which the court found wasn't germane to that device's principle of operation. You had two kinds of circuitry, an optical circuitry and a wire circuitry. Mr. Ryan, you've got a considerable uphill burden, don't you, considering the deference we give to the PTO in fact-finding? Well, Your Honor, we have argued that the determination of the principle of operation is – in fact, it has been treated as a question of law rather than a question of fact. And I can show you how we got there in MUTET. Is that true with respect to appeals from the PTAB? I believe it is. That's in light of MUTET. So in MUTET, and I'm referring to page 1332, there's two prongs to the question. There's, you know, what is the definition of the principle of operation of the prior art, which is Falk? And then second to that, the question is, does substantial evidence support the notion that the principle of operation of Falk, once defined, is affected by the combination? I don't understand. You're talking about the principle of operation of a prior art reference, right? Correct. Well, what a prior art reference discloses is unequivocally a question of fact in all of our case law. What its intended purpose is is a question of fact, but you're telling me now that we ought to somehow exact out the principle by which it operates and treat that as a legal question, despite volumes of cases saying that what a reference discloses is fact? Right. How do you parse that out for treatment as a question of law? Well, in MUTET, the question of whether or not the principle of operation was affected is clearly a question of fact. And the court noted that in MUTET, that the board's finding was supported by substantial evidence. But if you back up to the first part of defining the principle of operation, the court said, quote, the board found, and we agree, that the principle of operation of Falk's computing device is its high-level ability to receive inputs, and so on. So there were two prongs to the question going on there, and the court didn't discuss whether or not the definition of principle of operation given to the board was supported by substantial evidence. The court just simply said they agreed with the board. And if it were a question of substantial evidence, it wouldn't matter if the court agreed with the board. It would just matter whether or not it satisfied the level of substantial evidence. But that's an awfully tangential way of getting to your point when we have such a large volume of cases that say what a reference teaches, what a reference discloses is a question of fact. You're going to hinge your entire argument on the fact that the court agreed with it? I don't think there's anything wrong with agreeing with it, right? I mean, I could tell you you look nice, or I could tell you you look great. Great doesn't preclude nice. The principle – I know there are volumes of case law saying the scope and content of priority is a question of fact. But the principle of operation – there really isn't a volume of case law on this notion, particularly post-KSR. When you set out to define the principle of operation of a reference for purposes of an obviousness analysis, the entire analysis can fall apart if the priority is given the incorrect definition. It won't satisfy the legal strictures of KSR. It's the same definition. It's not a definition. It's what the reference teaches, how it operates, what's its intended use. Those are just quintessential fact questions, and I'm definitely not persuaded that Moutet somehow establishes that it's a legal principle. I'm not persuaded that anything about the volume of our case law that says what a reference discloses is a question of fact. And so far, you haven't convinced me why, from a policy standpoint, I ought to treat this differently than all of those. Well, it's also true that this court reviews the board's decisions de novo to make sure they comply with the legal standards set forth, including in KSR. And if the selection of the principle of operation by the board immediately falls by the wayside of KSR's teaching, then I think it is appropriate for a de novo review of that. And the court stated it more annually. On appeal, this court reviews the board's compliance with governing legal standards de novo. What's the legal standard that's at play here? It seems to me that you've been referencing matters that are factual in nature, and there we look for substantial evidence. So if you want us to apply a standard other than substantial evidence, then point to the legal standard or the legal principle upon which the PTAB erred. Yes. So the PTAB, when the PTAB articulated the principle of operation of FACUDA, the PTAB ignored many of the tenets of KSR, including that a reference can teach, a person of skill in the art can find instruction and reference beyond his primary purpose, that a person of skill in the art can find instruction from a reference, even if that reference is addressing different questions. These are principles of KSR that get quashed if the principle of operation is incorrectly defined. So looking at the FACUDA reference, figure one, the way I understand it is, the problem is, where would you fit two cylinders containing source material? Right. And the PTAB said, if you fit two cylinders within the FACUDA reference, you're going to change its primary purpose because you're going to eliminate the backstop valves. Is that correct? Well, actually, so originally the proposal for the combination of FACUDA and Morris was simply replacing the, if you're looking at figure one, what are called in the specification the supply sources, the undefined or the generically presented supply sources, the hardener and the main component, which are pump driven. So the idea would be to take the cylindrical cartridges to simply contain the components, the liquid components, to be mixed and sprayed in cylindrical cartridges. It was as simple as that. And there's no teaching in FACUDA that we see that would prevent that. In fact, FACUDA, you know, in kind of generically defining the supply sources without any indication of their structure, you know, would indicate to a person of skill in the art that, why not? Let's use cylindrical cartridges. And there's a motivation for doing that in Morris. If you look at Morris, Morris discloses essentially two embodiments. There's figure two, which is a, Morris, by the way, is JA100 of the appendix. So am I incorrect that the board found that if you combine Collin with FACUDA, regardless of where you put the cylinders, that you're going to render inoperable or not be able to utilize these backstop valves? You are correct, Your Honor. That's what the board found. Well, it seems pretty common sense to me that you've got two cylinders and you have in figure one a hardener in the main component. Why wouldn't those four cylinders go there or go anywhere as long as they're prior to the backstop valves? Yes, Your Honor. That's been our argument. And as I was saying, I think it's supported by Morris. If you look at Morris figure two, it discloses a pump-driven system where the components are kept in reservoirs, A and B. That's at page 101 of the appendix, which appear similar, at least the supply sources of figure one of FACUDA. And then you go on to figure four. And in Morris, at column seven, it says the invention, meaning the invention previously discussed in figure two, can also be applied to an entirely handheld model using two cartridges labeled as items. Mr. Ryan, you wanted to save some rebuttal time. You're well into that. You can either continue now or we'll save it for you in three minutes. Yes, Your Honor. I'll reserve. Thank you. Mr. Dick or Dickie? Dickie. May it please the Court. My name is Matthew Dickie. I'm appearing on behalf of Soldier Mix-Back. The bulk of the issues on appeal today are factual findings regarding the scope and content of the prior art references, which are reviewed for substantial evidence. We believe the Board clearly articulated substantial evidence for those factual findings, and those factual findings led to a straightforward application of the law, including KSR and post-KSR cases. Did the Board make a finding as to the level of skill that would be possessed by a person of ordinary skill in the arts in this particular instance? No, Your Honor. The Board did not make that finding. Are they required to do that? I don't believe they're required to do that. I think that the case was driven by attorney argument on combinability. The record is void of evidence introduced by PLASPAC regarding what that level of skill would be and why those references wouldn't be. Doesn't non-nogginess analysis involve a person of ordinary skill in the art? Yes, it does. And you're saying that here the record is devoid of such an analysis? I do acknowledge I don't see a specific articulation of that standard by the Board. But didn't Graham, which was affirmed by KSR, say that the level of possession has got to be an actual finding, an express finding, and an obvious misdetermination? Yes. I think the level of skill in the art, I would say in this case, is woven into the findings of the Board and their navigation. Was there a dispute between the parties in this case over the level of skill in the art? No, there was not. Both parties addressed the entire issue without – there was never an instance where, you know, if you find level of skill is X, then this is relevant. If you don't, then it's not. That's correct. That argument was not made. There didn't seem to be a dispute between the parties, but neither party proffered, you know, in a formal sense, level of skill in the art is a mechanical engineer with X number of years of experience in this industry. I don't believe that those arguments were proffered in the record. Does that absolve the PTAB or, say, a district court from the Supreme Court's finding in Graham and KSR that you have to conduct an analysis of obviousness with respect to a person of ordinary skill in the art? I need to understand the question. Were they not following Graham? If the attorneys don't specifically argue that issue, does that absolve a court, the PTAB or district court, from making a determination as to the level of skill possessed? I would say in this case it does because that issue was not disputed between the parties. Throughout the course of both of these proceedings, the combination of Fukuda and Morris, for example, was navigated by the board in two different contexts. Both sides made arguments. We believe it was Plaszczak's burden to present evidence why one of skill in the art of 2004 in this industry would not have made those combinations. How can we determine whether something is obvious if we don't know who it's obvious to? I think that this case is driven by the board's factual findings, which lack the dispute between the parties regarding what the level of skill in the art was. Would you say that that's an argument which, if not made, is waivable rather than a jurisdictional issue which is not waivable? I think it's an argument that's waivable. I think in many cases before the PTAB, I think that I could proffer that it wasn't disputed between the parties, but the level of skill in the art, if somebody in that industry in 2004 was a mechanical engineering degree, I don't think there was an issue that hinged on that determination in this case. So I would say that it is a waivable issue because in this case it wasn't dispositive. And we're simply looking at factual findings made by the board regarding the scope and content of the references. Plaszczak didn't assert that those factual findings should somehow be uprooted because the level of skill in the art wasn't defined or that the level of skill in the art wasn't defined. Are you familiar with our case in Randall Manufacturing? Yes, I am. And there we say that to determine the obviousness of a patent, the court should analyze the prior art in the context taken into account, the demands to the design community, et cetera, the background knowledge possessed by a person of having ordinary skill in the art. So an obviousness analysis is done through the perspective of the person of ordinary skill in the art, correct? That's correct. And you're saying that that requirement can be waived or not addressed at all in an obviousness determination? I dare to say, I don't want to say it's inherent to the determination, but I guess I am saying it can be waived to the extent that the parties aren't disputing it. There's no issue on appeal that hinges on Plaszczak asserting the level. Plaszczak has not asserted that the fact that the board did not articulate the level of ordinary skill in the art was an error, nor did they articulate that that would change any of the board's factual findings and legal conclusions. And I would note, too, in the Randall Manufacturing case, the issue on appeal was the consideration of various references, which would give background. And in that case, the lack of consideration of those references was on appeal. In this case, we don't have such issues. Would you also say that this isn't nuclear physics, that this is fairly simple stuff? I would dare to say the combinations at issue aren't necessarily simple, but they're not rocket science. Well, and for that matter, counsel, I mean, I'm reading the statement of issues in the blue brief in this case, and none of the statements of the issues are asking this court to reassess obviousness, are they? They're only asking us to decide whether or not the principle board correctly found the principle of operation in Fukada. This is not even a scenario in which we have to put ourselves in the shoes of one of skill in the art to determine the ultimate question, because that's not what's on appeal. It's only the underlying fact findings that undergirded the decision of obviousness. That's exactly right. In this case, we have the intended use of the Jacobson reference, and we have the principle of operation. But who would determine the intended use? I mean, and why is it important when we're comparing references? If one reference is not applicable because it would render Fukuda, for example, here, either inoperable or change its principle of purpose, who determines that? I believe the fact finder determines that. KSR, as Plaspec would have it read, anything would be obvious. The KSR does note that everything, in a sense, is a combination of known elements. But to guard against hindsight, we still have to articulate some sort of rationale for combining references. And lines of case law such as Moutet and such as Dupuis-Spine, which are post-KSR, give us guidance on when something, there would or would not be an inference of obviousness. Okay, so let's go to this first issue, the Fukuda reference. And if I understand this correctly, the board said that if you combine Collin to Fukuda, you're going to negate the use of the backstop valves, correct? That's correct, yes. And they said, and for that reason, and it's not the board that wouldn't combine, for that reason, a person of ordinary skill in the art would not combine Collin with Fukuda, correct? That's correct. Okay, so we're looking at this from the perspective of somebody, whether it's articulated or not. Every August determination is done through the lens of a facetum. Yes. Okay, so here, now I want you to go to Figure 1 and answer this question. Why can't you get the two cylinders in Collin, which are Mark 15 and 16 in Figure 1 of Collin, and simply put them where the hardener and the main components are, put one in one, and 15 where the hardener is, 16 where the main component. And if you do that, how does that affect the operation of the back valves? I mean, this is pretty simple technology here. I think as one of skill in the art, there's a couple points I'd like to make, if I may, on the combination. First of all, the prior references, Fukuda and Morris both illustrate that at the time, there were two different types of systems. There were larger volume systems, such as Fukuda, where two different components would come from larger tanks and be sprayed, and I'm referring to Fukuda. And then in the Morris reference, there were handheld devices, such as that illustrated in Figure 4 of the Morris reference, which had piston RAM arrangements. These were two completely different types of systems. In the background of Fukuda, I remember referring to page 96 of the Joint Appendix, it explains that in preexisting systems, there may be a valve which was located upstream of the juncture of components. But in those systems, when they were operating at high velocities or when the backflow was occurring repeatedly, the hardener could still flow back into the back valves of those systems. So as articulated at column 2 of page 96, there was a need for systems that at high velocities and when backflow was repeated, to design new systems that would prevent this type of backflow. So once the board had to make a decision as to what the principle of operation was of the Fukuda reference, and it determined the principle of operation was this particular combination of pumps and valves to prevent backflow. Once it made that factual determination, the law is that if there's an inference of non-obviousness, if the principle of operation in a combination would be defeated. So the factual conclusion in this case, which is reviewed for substantial evidence, ultimately drives the legal finding. As to common sense, I would say that KSR still has boundaries. Once you look at the architecture of Figure 1 of Fukuda as one of ordinary skill in the art, KSR still instructs that you may have to have some sort of rational underpinning or articulated reason for combining references. The board felt that they had not provided sufficient evidence or rationale as to why one would hook up a different type of system, the handheld device, to this complex network of pumps, check valves, stop valves, and escape valves, and why one would make that combination. If I may, I'd like to make a couple of points on the Moutet decision as well, since that seems to be heavily relied upon by PLASPAC. We'd like to note that not only does the Moutet decision at 1332 specifically spell out the standard of review for the principle of operation and whether or not the principle of operation is defeated, On page 1331, Moutet even goes so far as to say that the fact finder can even come to different inconsistent conclusions, and these are the epitome of the types of cases from the board that should be affirmed. At the end of Moutet, on 1334, the court even goes so far as to say that the other side's interpretation of a reference is plausible, but the issue can't be reviewed because it would be the no-vote review. And finally, in the Moutet decision, the board was affirmed. I would like to now turn my attention to the combination of Jacobson and Hunter. PLASPAC alleges that the board also somehow legally erred in its application of the principles of KSR and post-KSR case law. Once again, the Jacobson is directed to a spraying device, pardon me, to a crack-filling device, and the Hunter reference is directed to a spray device. We note that in its reply briefing, PLASPAC doesn't address the DuPuis-Spine case on the merits, but rather just incites the predictable result citation from the beginning of DuPuis-Spine. When the specific facts of DuPuis-Spine are reviewed, the district court's non-combinability of two references, where one reference would defeat the intended purpose of another, was appealed. In that case, spine screws were at issue, and in one reference you had a space that created a shock absorber effect, and in the other reference you had a compression member. And the court held that you wouldn't combine those references where, and I quote, the prior arts teaching undermines the very reason why those references would be combined. Just as in the case of Jacobson, the board made factual findings that Jacobson is directed to a crack-filling device, and factual findings that Hunter is directed to a spray device. And consistent with DuPuis-Spine and Broadcom and post-KSR cases, we're instructed that there's a strong inference of non-obviousness in those instances. Was there any evidence that implementing Fukuda sources as the cylindrical cartridges would render the entire system inoperable? I think the record focused on the fact that there was no indication as to how that system would operate. And I'd also like to note something else, and Morris, too. Wouldn't you say that Fukuda reads on all the limitations except for the cylindrical cartridge? I believe another reference was used for a flexible hose. I believe that much of the architecture of the system is in place, but again, they're two fundamentally different types of systems. For this pen, does Fukuda not teach all the claim limitations except for the cylindrical cartridges? Fukuda doesn't teach it, doesn't specifically recite a flexible hose. And it doesn't specifically recite a two-component cartridge, which is connected to that system. But importantly, I note, too, that there's disclosure in Morris that explains, also, that that's directed to a type of system where the valve is located downstream of the mixer. They're antithetical systems. Thank you, Mr. Dickey. Thank you. Mr. Ryan has just under three minutes for rebuttal. Mr. Dickey was speaking a little bit about the disclosure of Morris. He was making the point that Figures 2 and Figure 4 of Morris are completely unrelated embodiments. I just don't think that's supported by the reference. Morris at Figure 7 says, as I said before, the invention can also be applied to an entirely handheld model. And as far as motivation to combine them, down at Line 55, Morris says, the alternative embodiment, meaning the compact handheld one with the cylindrical cartridges, is especially compact and allows much portability. We argue that that's reason enough to apply the compact two-cartridge system of Morris to Fukuda. When you're talking about spray systems, spray guns, portability, flexibility are just clearly of importance. Now, on Jacobson, the problem with the Jacobson, the board didn't Jacobson, is I think it's an incorrect statement of law to say that a combination of references can't interfere with the intended use of one of the references. If you read the cases, like the Placebine or ICON, what they're saying is, the combined references must be able to serve the intended use of the combination, meaning the ultimate combination, meaning the claimed device. So the question is, if you combine Hunter and Jacobson, can they perform the function of, for example, claim one of the 384 patents? That's the question. Not whether Jacobson would still be able to fill cracks. In fact, KSR contemplates that a reference won't be useful for its intended purpose. It says a person with skill in the art can look to a reference for uses beyond its primary purpose. It can look to a reference to provide answers to questions that are not, provide answers to problems that are not the same problem that the reference is looking to. So, unless there are any further questions, I'll conclude. Thank you. Mr. Ryan will take this case under advisement.